*302 OPINION OF THE COURT
Deborah Stevens Módica, J.
A hearing was held on May 11, 2017 to determine the admissibility of statement evidence and physical property. The following constitutes the decision and order of the court.
Findings of Fact
Police Officer Thomas Lane, a 12-year veteran of the New York City Police Department, testified that on June 6, 2016, he was working as part of the 103rd Precinct anti-crime unit, was dressed in plain clothes, and was assigned to an unmarked vehicle with Police Officers Durkin and Gasperetti. Prior to joining the anti-crime unit, Lane had received training regarding identifying forged credit cards both at the police academy as well as in the field. Lane learned about the characteristics of forged credit cards as well as how to use a magnetic strip swiping machine.
At approximately 6:50 p.m., Officer Lane was driving northbound on 177th Street in the vicinity of Liberty Avenue when he observed a black Chrysler 200 automobile, which was occupied by two black men, which was headed southbound, under the train trestle, at a high rate of speed—approximately 50 miles-per-hour in a 25 miles-per-hour zone. That vehicle matched the description of a vehicle which Lane had received earlier that two black males, one of whom had a goatee, were in a black Chrysler 200 or 300 with New Jersey license plates and were making threats with a gun.
After observing the vehicle, the officers made a quick U-turn, activated their vehicle’s lights and sirens, and pursued the Chrysler as it increased speed while heading southbound on 177th Street towards 106th Avenue. At 106th Avenue, the vehicle made a right-hand turn without signaling, causing pedestrians on the sidewalk to have to jump backwards, and then proceeded westbound on 106th Avenue. The Chrysler then made a left-hand turn onto Polhemus Avenue without signaling and then made an abrupt stop in the middle of the street. Officer Lane and his partners exited their vehicle, guns drawn, and approached the Chrysler. Lane approached the passenger side, where the defendant, Tyran Dent, was sitting. Codefend-ant Laki Johnson, who had a goatee, was sitting in the driver’s seat of the vehicle, laughing, and said “I saw you guys back *303 there when you turned your lights on; I was not going to stop but I figured I would anyway.”[1]
From his vantage point outside the passenger-side window, Officer Lane observed two credit/debit cards sitting in the cup holder in the center console of the vehicle. Lane asked the defendant if he had any identification on him and the defendant stated that he did not, but stated that his name was Tyran Dent. Officer Lane recognized the defendant because the Police Department had identified both the defendant and his code-fendant as gun recidivists and members of the “POV City” gang. As part of his assignment in anti-crime, Officer Lane was responsible for making himself familiar with known gang members and criminal activity, and that is how he recognized the defendant. The codefendant had a picture of his driver’s license on his cell phone. Lane had never arrested the defendant before, but had previously arrested the codefendant two times and had had other interactions with him during previous traffic stops. Officer Lane testified that, based upon his experience and training, the POV City gang, which the defendant and codefendant are members of, is known to engage in forged credit card activity.
Officer Lane asked both the defendant and codefendant about who owned the Chrysler automobile. The vehicle had a bar code on it, which indicated to Lane that it was a rental car. The codefendant stated that one of his friends had rented the vehicle, but he was unable to produce a valid rental agreement. Officer Lane asked if either the defendant or codefend-ant knew who the credit/debit cards belonged to and why they were in the center console and they both responded that they had no idea whose cards they were.
Officer Lane and his partners removed the defendant and co-defendant from the vehicle because they fit the description given in the previous radio run and because the codefendant only had a picture of his driver’s license on him, as well as there being unclaimed credit/debit cards in the center console. The defendant and codefendant were taken to the back of the vehicle while Officer Lane tried to contact Enterprise Rent-A-Car to obtain rental information, but he was unsuccessful.
*304 Officer Gasperetti placed the codefendant in handcuffs and found three additional forged credit cards in his pocket. Lane and Officer Durkin tried to handcuff the defendant, but the defendant escaped into backyards, despite a police chase.
When Officer Lane returned to the vehicle, he recovered the two credit/debit cards from the center console, and examined them. One of the cards had a signature strip on the back which was not signed, both cards had scuff marks on the numbers, and the numbers appeared distorted and slightly off as if they were not professionally punched. None of the cards had the names of either the defendant or codefendant on them. Officer Lane testified that the fact that the cards were in the center console, rather than in someone’s wallet or pocket, as well as the fact that the defendant and codefendant were known gang members and each had prior arrests for forgery were all facts that led him to conclude the cards were forged.
Officer Lane ran both cards through a magnetic swipe reader and verified that the number on the front of the cards did not match the numbers on the magnetic strip.[2] Lane testified that based on his training and experience, if the numbers on the front of the card do not match the numbers on the magnetic strip, the card is forged. Photographs of the forged credit/debit cards recovered from the center console and the codefendant’s pocket were received into evidence at the hearing.
As he ran the credit/debit cards through the magnetic swipe reader, the information on the magnetic strip appeared on his computer screen. Lane then added the numbers which appeared on the front of the card and the type of credit card, as well as his name, the defendant’s name, and the arrest number on the document, which was received into evidence at the hearing. Without the card reader, Officer Lane would still have been able to confirm that the card was forged by contacting the bank to determine what information was on the magnetic strip.
On July 25, 2016, Officer Lane traveled to the Criminal Courthouse in Queens County and at approximately 1:50 p.m., he observed the defendant standing in front of Supreme Court Part K-7. The defendant then ran down the hallway and down the steps to the ground floor. He ran northbound on the ground floor until he reached the elevator bank where there happened *305 to be another police officer. The defendant then turned right into the area by the elevator bank where there were court officers standing around. The defendant threw himself on the ground, curled up into the fetal position, covered his hands, and refused to be handcuffed. After some time, the defendant was handcuffed and arrested.
The person who had called 911 about a gun earlier that day was interviewed by Lane’s sergeant. That person stated that he was arguing with two black males, one of whom had a black goatee, who were in a black Chrysler 200 or 300, about a traffic situation where one vehicle cut off the other. The driver of the Chrysler said “I have had enough of this” and motioned into his waistband as if to get a weapon. The other driver drove off and called 911.
The court credits the testimony of Police Officer Lane.
Conclusions of Law
The Stop of the Defendant’s Vehicle
The court finds that the stop of the vehicle in which the defendant was a passenger was based upon probable cause. When he initially observed the Chrysler automobile, Officer Lane testified that the vehicle was driving at a high rate of speed—approximately 50 miles-per-hour in a 25 miles-per-hour zone. That alone justified the stop of the defendant’s automobile (see Vehicle and Traffic Law § 1180-A; People v Robinson, 97 NY2d 341 [2001]; Whren v United States, 517 US 806 [1996]; People v Ferraiolo, 309 AD2d 981 [3d Dept 2003], lv denied 1 NY3d 627 [2004] [holding that a police officer may lawfully stop a motor vehicle when a traffic infraction has occurred even if the officer has no intention of issuing a traffic citation]). Additionally, the defendant’s vehicle matched the description for a vehicle which potentially contained a firearm, based on the radio run earlier that day for a black Chrysler 200 or 300 automobile with New Jersey license plates with two black men inside, one of whom had a goatee. The defendant, who was black, was a passenger in a black Chrysler 200 with another black man inside, who had a goatee. These facts also made the officers’ stop of the defendant’s vehicle lawful (People v Parris, 83 NY2d 342 [1994] [holding that an identified citizen informant is presumed to be personally reliable]; see People v Johnson, 66 NY2d 398 [1985]; People v DiFalco, 80 NY2d 693 [1993] [holding that the veracity of an informer may be satisfied by corroboration of details of the information provided, even if *306 those details were not, in and of themselves, suggestive of criminal activity]; see generally Aguilar v Texas, 378 US 108 [1964]; Spinelli v United States, 393 US 410 [1969]). Finally, the code-fendant committed several additional traffic infractions when he made two turns without signaling and drove at a high rate of speed. These traffic violations were also enough, in and of themselves, to justify stopping the defendant’s vehicle (see Vehicle and Traffic Law §§ 1163 [a]; 1180-A; People v Robinson). Therefore, the court finds that the black Chrysler 200 automobile in which the defendant was a passenger was lawfully stopped by the police.
Recovery of Physical Evidence from the Vehicle
In order to challenge the recovery of the two credit/debit cards recovered from the center console of the vehicle, the defendant must have standing to challenge the recovery. Indeed, in People v Ramirez-Portoreal, the Court of Appeals held that “[a] defendant seeking suppression of evidence has the burden of establishing standing by demonstrating a legitimate expectation of privacy in the premises or object searched.” (88 NY2d 99, 108 [1996].) Determining what constitutes a “legitimate expectation of privacy turns on consideration of all of the surrounding circumstances, including but not limited to defendant’s possessory interest.” (Id. at 109.) Here, the defendant is charged with, inter alia, constructive possession of two debit cards which were recovered from the center console of a motor vehicle in which he was a passenger. A defendant charged with possession of contraband under a theory of constructive possession does not automatically have standing to contest the constitutionality of a police search (People v Wesley, 73 NY2d 351 [1989]). As the passenger in a rental vehicle, the defendant did not have a reasonable expectation of privacy in the place searched because the vehicle was rented by another individual and the defendant did not establish his right to drive or possess the vehicle at the hearing (People v Miller, 298 AD2d 467 [2d Dept 2002], lv denied 99 NY2d 561 [2002]; People v Sanchez, 64 AD3d 618 [2d Dept 2009], lv denied 13 NY3d 799 [2009]). In fact, neither the defendant nor his codefendant could produce rental information for the vehicle. As such, the court finds that the defendant lacked standing to challenge the recovery of the two debit cards.
Even if the defendant had standing, his actions, taken as a whole, constitute abandonment of the debit cards and therefore, abandonment of his legal standing to challenge their seizure.
*307 “Property is deemed abandoned when the expectation of privacy in the object or place searched has been given up by voluntarily and knowingly discarding the property. The result is a waiver of the constitutional protection.” (People v Ramirez-Portoreal at 110.) The court finds that the defendant abandoned the two debit cards and therefore forfeited his standing to challenge the search. Before the defendant exited the motor vehicle, Officer Lane asked the defendant and codefendant to whom the debit cards in the center console belonged. Both the defendant and codefendant stated that they did not know. Then, when the defendant got out of the motor vehicle, he ran away, eluding police apprehension on that day. The court credits the testimony of Officer Lane that the debit cards were recovered from the vehicle after the defendant ran away from the scene. The defendant voluntarily and knowingly gave up his expectation of privacy when he fled the scene and avoided apprehension. (See People v Ramirez-Portoreal; People v Scott, 82 NY2d 729 [1993] [holding that a defendant who left a bag containing drugs on the floor of a livery cab which was stopped for passing a stop sign had abandoned the drugs by running away from the cab and leaving the drugs behind].)
In any event, the court finds that Officer Lane’s observation of the debit cards in the center console was made from a lawful vantage point after lawfully stopping the defendant’s vehicle (Horton v California, 496 US 128 [1990]; People v Spinelli, 35 NY2d 77 [1974]; cf. Arizona v Hicks, 480 US 321 [1987] [holding that an object cannot be in plain view if its existence was discovered as the result of a search]; People v Diaz, 41 NY2d 876 [1977], cert denied 434 US 939 [1977]; People v Lemmons, 40 NY2d 505 [1976]). The court further finds that Officer Lane had a reasonable suspicion that the debit cards might be fraudulent based upon the totality of the circumstances. Most importantly, the defendant fled the scene without, at that point, having committed any apparent crime or infraction which would have warranted his arrest. Thus, the defendant’s flight can reasonably lead to an inference of consciousness of guilt. (People v Cintron, 95 NY2d 329 [2000].) In addition, the defendant and codefendant were known to members of the New York City Police Department as gang members in a gang that was known for fraudulent credit/debit card activity and their statements that they did not know who the debit cards belonged to was inherently suspicious. Finally, the codefendant indicated that their friend had rented the vehicle but could not provide rental information.
*308 Once the debit cards were seized, Lane observed that the numbers on the front of the cards were distorted and appeared to have been printed by an amateur rather than by a professional company or bank. This, coupled with the totality of the circumstances as just described, led to a reasonable belief that the debit cards were forged. The court finds that Officer Lane had a legal basis to then swipe those two debit cards through a magnetic strip reader in order to determine what, if any, information was contained on the magnetic strips.
At the conclusion of the hearing testimony, the defendant’s attorney argued that Officer Lane should have applied for a search warrant prior to swiping the cards, and, without a warrant, this “search” was illegal and the information contained on the magnetic strips must be suppressed as “fruit of the poisonous tree.” The court disagrees. In what appears to be a case of first impression in New York,[3] the court notes that both federal and other state courts have held that there is a diminished expectation of privacy in the magnetic strip on the back of credit, debit, and gift cards.
A credit card swipe can have only two possible outcomes: (1) either the information on the strip is legitimate and the card is not forged or (2) the information on the strip is different from the information printed on the front and the card is therefore forged and contraband. For the purposes of this analysis, the court acknowledges that banks do not generally produce credit or debit cards which have one set of financial information stamped or printed on the front of a card and a different set of financial information on the magnetic strip of those cards. (United States v Medina, 2009 WL 3669636, 2009 US Dist LEXIS 104158 [SD Fla, Oct. 24, 2009, No. 09-20717-CR], revd on other grounds 2009 WL 3669537, 2009 US Dist LEXIS 104155 [SD Fla, Nov. 4, 2009, No. 09-20717-CR].) This discrepancy between the information recorded on the front and the back is what leads to the prosecution of forged credit and debit card cases under Penal Law § 170.25. Cards which have been re-encoded with new financial information on the magnetic strips are counterfeit. (United States v DE L’Isle, 825 F3d 426, 431 [8th Cir 2016].) “[Governmental conduct that only reveals *309 the possession of contraband ‘compromises no legitimate privacy interest.’ ” (Illinois v Caballes, 543 US 405, 408 [2005], quoting United States v Jacobsen, 466 US 109, 123 [1984].)
The Fourth Amendment protects against physical intrusion or trespass by government officials. However, if a person has a reasonable expectation of privacy in an item which is searched, such as the contents of a cell phone, government intrusion into that item can also lead to a violation of rights (see Katz v United States, 389 US 347 [1967]). In order to establish a violation, the defendant must establish both “an actual (subjective) expectation of privacy, and . . . that the expectation [is] one that society is prepared to recognize as reasonable.” (United States v DE L’Isle at 431 [internal quotation marks omitted], quoting United States v Katz at 361.) In United States v DE L’Isle, the Court of Appeals for the Eighth Circuit held that scanning the magnetic strip on a card “was not a physical intrusion into a protected area prohibited by the Fourth Amendment.” (Id. at 431.) Because “ ‘sliding a card through a scanner to read virtual data does not involve physically invading a person’s’ space or property, there was no Fourth Amendment violation under the original trespass theory of the Fourth Amendment.” (Id. at 431-432; see United States v Alabi, 943 F Supp 2d 1201, 1265 [D NM 2013].) This court agrees with the Eighth Circuit and holds that using a magnetic strip reader does not constitute a physical intrusion and, therefore, there is no Fourth Amendment violation under that theory. This court agrees with the Eight Circuit’s reasoning that “[t]he process of using a credit card reader is analogous to using an ultraviolet light to detect whether a treasury bill is authentic, . . . [which is not a] search.” (United States v DE L’Isle at 431 [internal quotation marks omitted].) The court further finds that the use of a credit card reader can also be analogized to an officer testing whether a knife will open through the force of gravity or field testing marijuana to confirm that the substance recovered is, in fact, marijuana, neither of which is considered a search.
As to whether there is a legitimate expectation of privacy in the magnetic strip information, and whether society recognizes that expectation as reasonable, “the purpose of a credit, debit, or gift card is to enable the holder of the card to make purchases, and to accomplish this, the holder must transfer information from the card to the seller, which negates an expressed privacy interest.” (Id. at 432.) When using a credit, debit, or gift card, the holder “knowingly disclose [s] the infor *310 mation on the magnetic strip of [the] card to a third party and cannot [then] claim a reasonable expectation of privacy in it.” (Id.) Therefore, the court finds that there is no reasonable expectation of privacy in the magnetic strip information of credit, debit, or gift cards.
Even assuming arguendo that there was a reasonable expectation of privacy, this privacy interest is not one that is recognized by society as reasonable because, on legal cards which have not been forged, the information on the magnetic strip is also stamped, in plain view, on the front of the card so that any member of the public may see it when the card is being used. (United States v DE L’Isle at 432; United States v Alabi at 1276.) In addition, “[u]nlike cell phones and computers, whose function of storing personal information often results in access being restricted by a password,” the purpose of a credit, debit, or gift card is to “transfer information from the card to the seller, which negates an expressed privacy interest.” (United States v Turner, 839 F3d 429, 436 [5th Cir 2016], quoting United States v Bah, 794 F3d 617, 633 [6th Cir 2015].) Indeed, “a credit card’s stored information ... is intended to be read by third parties. That is the only reason for its existence” (United States v Bah at 633, quoting United States v Benjamin, 2014 WL 5431349, 2014 US Dist LEXIS 151078 [D Neb, Oct. 24, 2014, No. 4:14-CR-3089]). This court is persuaded that neither the courts nor society recognize a reasonable expectation of privacy in the information contained on the magnetic strip of credit, debit, or gift cards. Once the debit cards were recovered lawfully, Officer Lane properly swiped the cards through the magnetic strip reader and determined that they were forged. Based on all of the above, the defendant’s motion to suppress physical evidence is denied.

. Codefendant Laki Johnson did not appear in court on March 1, 2017, and a bench warrant was ordered. As of the date of this decision, Johnson has not since appeared and the warrant is still active. As a result, the suppression hearing was conducted only with respect to defendant Tyran Dent.

. Officer Lane testified that a magnetic strip reader is a device that plugs into a USB port on a computer and automatically displays information about the contents of the magnetic strip when a credit card is swiped through it.

. After a diligent search, this court has uncovered relevant case law from the Fifth Circuit Court of Appeals, the Sixth Circuit Court of Appeals, the Eighth Circuit Court of Appeals, various Federal District Courts, and state courts from Georgia and South Carolina. Neither the People nor defendant have cited relevant case law on this issue.