RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0164p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAMADOU BAH (14-5178); ALLAN MARCUS HARVEY (14-5179),

*Defendants-Appellants.*

Nos. 14-5178/5179

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:13-cr-00048—J. Ronnie Greer, District Judge.

Argued: June 19, 2015

Decided and Filed: July 24, 2015

Before: ROGERS and MCKEAGUE, Circuit Judges; SARGUS, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Laura E. Davis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant in 14-5178. Jonathan Sevier Cave, THE CAVE LAW FIRM, PLLC, Greenville, Tennessee, for Appellant in 14-5179. Suzanne Kerney-Quillen, UNITED STATES ATTORNEY'S OFFICE, Greeneville, Tennessee, for Appellee. **ON BRIEF:** Laura E. Davis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant in 14-5178. Jonathan Sevier Cave, THE CAVE LAW FIRM, PLLC, Greenville, Tennessee, for Appellant in 14-5179. Suzanne Kerney-Quillen, UNITED STATES ATTORNEY'S OFFICE, Greeneville, Tennessee, for Appellee.

_____

[*]The Honorable Edmund A. Sargus, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.   This case addresses whether an individual has a reasonable expectation of privacy in the magnetic strips on credit cards.  On May 23, 2013, Morristown Police Corporal Todd Davidson stopped a rental vehicle driven by Mamadou Bah for speeding in a construction zone.  During the traffic stop, officers placed Bah under arrest for driving on a suspended license and detained passenger Allan Harvey for "investigatory purposes" after discovering approximately 72 credit, debit, and gift cards in the rental car's glove compartment and trunk.  Bah and Harvey filed motions to suppress evidence of the credit, debit, and gift cards and cell phones found in the car in district court, alleging that the officers had violated their Fourth Amendment rights by: (1) unlawfully searching the rental car in which Bah and Harvey were driving, incident to Bah's arrest; (2) scanning the magnetic strips on numerous credit, debit, and gift cards found inside the vehicle, without first obtaining a warrant; (3) performing a warrantless search of a Blackberry cell phone; and (4) unlawfully detaining Harvey following Bah's arrest.  The district court denied their motions, and Bah and Harvey appeal.  Because Harvey does not have standing to contest the search of Bah's rental vehicle, Harvey was reasonably detained during the traffic stop, the warrantless search of Bah's Blackberry did not taint the subsequent cell phone searches conducted pursuant to a warrant, and scanning the magnetic strips of credit and gift cards was not a search, the district court properly determined that neither Bah nor Harvey's Fourth Amendment rights were violated.

On May 23, 2013, Morristown Police Corporal Todd Davidson stopped a white Nissan Altima for traveling 56 miles per hour in a 35-mile-per-hour construction zone.  Davidson approached the vehicle and found Mamadou Bah in the driver's seat and Allan Marcus Harvey reclined in the front passenger seat, "as if he [had been] taking a nap."  Bah gave Davidson his license and documentation on the Hertz rental vehicle, and Davidson returned to his cruiser to perform a background check.  While running the background check, Davidson observed Harvey "fumbling around the passenger's side compartment as if he was either trying to conceal

something or retrieve something."[1]  Because Harvey's movements made Davidson nervous,[2] Davidson called for back-up.

Before back-up arrived, the records check revealed that Bah's license had been suspended.  Consequently, Davidson prepared to arrest Bah, pursuant to police regulation General Order 500.49.  Additionally, because Bah was the only driver listed on the rental agreement, Davidson decided to tow the vehicle.  Once Officer Derrick Johnson responded to the scene, and Davidson briefed him on the situation, Bah was arrested and secured in Davidson's police cruiser.  Johnson then ordered Harvey to step out of the vehicle, patted him down, and asked for Harvey's identification.

After Harvey exited the vehicle, Davidson searched it.  Bah's initial arrest report referred to the search as one conducted incident to Bah's arrest; during the motion to suppress hearing, however, Davidson testified that he had simply conducted an inventory search as required by department policy.  According to Davidson, General Order 200.04-B allows an officer— provided there is lawful justification to impound the vehicle—to "conduct an inventory search of the contents of the vehicle and all containers therein."  In addition to searching the glove compartment and trunk, Davidson requested a K-9 sniff because the car was a rental; Davidson did "not want the next renter or lessee of the vehicle to be caught with something that they didn't know was in the vehicle."

During the search, Davidson found a damaged Blackberry cellular phone in the driver's side door pocket, two cellular phones in the center console between the passenger and driver seats, an iPhone in the passenger side door pocket, several cartons of cigarettes in the back seat, four credit, debit, or prepaid gift cards in the passenger glovebox, and a large quantity of

---

[1]The magistrate judge found that the video of the traffic stop corroborated Davidson's testimony, stating:

> As [Davidson] called in Bah's drivers license information to his dispatcher and then awaited the results of his inquiry, he could easily see into the passenger compartment of the Altima.  The passenger, defendant Harvey, was in *constant motion*, moving from side to side, twisting and turning; his head would drop from time to time.  The movements were so constant, so extensive, and so lengthy, it immediately seized the attention of this magistrate judge as the video was viewed.

(Emphasis added.)

[2]Davidson stated several times during the motion to suppress hearing that Harvey's movements concerned him.  In particular, Davidson felt "uneasy about the stop," and was so concerned that he didn't "know if [Harvey] was retrieving a weapon [or] hiding something."

additional cards in a plastic bag in the trunk of the vehicle, inside a bag that Harvey said belonged to Bah. Upon discovering approximately 68 credit, debit, and gift cards in the trunk, Davidson "felt that the investigation needed to be furthered[, and] . . . needed to involve an investigator with the police department." Davidson then advised Harvey that, although he was "not under arrest," he was being placed in "temporary custody." Bah and Harvey were then both transported to the Morristown Police Department in handcuffs,[3] where four more cards were found in Bah's wallet, and five additional cards were found in Harvey's wallet. Johnson later found five additional cards in the back seat of the police cruiser in which Harvey had been transported to the police department for further investigation.

At the police department, Detective Tracy Bowman and Corporal Gary Bean examined the items from the rental vehicle and contacted Special Agent Kevin Kimbrough of the Tennessee Highway Patrol, who had experience with identity theft investigations. Bowman and Johnson—while waiting for Kimbrough and without a warrant—looked at a text message and several photographs on the unlocked Blackberry cellular phone. The photographs depicted "a large amount of cash," "what appeared to be marijuana," and a "skimming device," which can be used to re-encode magnetic strips. The locked cellular phones were not examined. When Kimbrough arrived, another officer showed him the photographs from the Blackberry cellular phone.

Kimbrough—also without a warrant[4]—then used a magnetic card reader, or "skimmer," to read the information encoded on the magnetic strips of 18 credit, debit and gift cards (those

---

[3]Police procedure required that all individuals transported in the back seat of a police cruiser be handcuffed.

[4]At the motion to suppress hearing, Kimbrough described the process of reading the cards as a "search" because the data on the strips could not be seen with the "naked eye." Nevertheless, he believed that he did not need a search warrant to scan the magstripes. Kimbrough explained:

> I have personally met with Helen Smith with the U.S. Attorney's office on previous cases where we had discussed whether or not the search warrants were required for the searching of these credit/debit cards, whether or not that constitutes a search that's required by search warrant, [and . . .] my understanding from me consorting with the U.S. Attorney's office [is that] we do not have to have a search warrant to search these cards.

Later in the hearing, however, Secret Service Agent Allen testified that scanning the magstripes on the cards was not a search. He reasoned: "They're not a computer. They're not a phone. They're not a device. In four different judicial districts that I've been in for the last 15 years, that's never been considered a search of any kind."

cards not found in the car's trunk[5]). A skimmer is a device similar to that used at gas stations, restaurants, and grocery stores to read the "magstripe," or magnetic strip, on cards. The magstripe of any credit, debit, or prepaid gift card typically contains limited, unique information: an account number, bank identification number (the six-digit number that identifies a particular financial institution), the card expiration date, the three digit "CSC" code, and the cardholder's first and last name. With the exception of the bank identification number and a "few other additional, unique identifiers," the information stored on the magstripe mirrors that provided on the front and back of the card. The magstripe does not typically contain an individual's birth date, social security number, mailing address, blood type or other personal data. Because financial transactions may be conducted using only the data printed on the front and back of a card, accessing the information stored on the magstripe is not always necessary to make a charge. An encoding device is required to change, or re-encode, the data on a magstripe.

Upon scanning the 18 cards, Kimbrough found that a "majority, if not all" of the magstripes had been re-encoded so that the financial information they contained did not match the information printed on the front and backs of the cards. Bah and Harvey were then taken into custody and transported to the Hamblin County Jail.

In total, officers recovered 86 cards from Bah, Harvey and their vehicle: four cards in the glove compartment, 68 cards in the trunk, four cards in Bah's wallet, five cards in Harvey's wallet, and five cards in the back seat of Johnson's cruiser after he had transported Harvey. Secret Service Special Agent Doug Allen determined that all 68 of the cards seized from the trunk of the rental vehicle had been re-encoded. The re-encoded account numbers had been either stolen or compromised, and a number of the associated accounts had already incurred fraudulent charges.

Based on his determination that the magstripes had been re-encoded with compromised or stolen account numbers, Allen obtained a federal search warrant for the cellular telephones seized following the traffic stop. The warrant affidavit did not refer to any of the information officers had already viewed on the Blackberry cellular phone. On May 30, 2013, Bah and

---

[5]The cards scanned included: (1) four cards found in Bah's wallet; (2) four cards found in the glove compartment; (3) five cards found in Harvey's wallet; and (4) five cards found in the back of the patrol car after Harvey had been removed.

Harvey were charged with production, use, or trafficking in counterfeit access devices, and later indicted.

Both Bah and Harvey moved to suppress the evidence obtained from the rental vehicle, arguing that the search could not be justified as a search incident to Bah's arrest under the rule of *Arizona v. Gant*, 556 U.S. 332 (2009). Bah further alleged that the officers, by looking at images on his cell phone and scanning the magstripes on the cards without first obtaining a warrant, had performed unlawful searches.[6] Harvey further contended that he had been unreasonably detained during the stop.

The United States replied that: (1) the search of the rental vehicle was a valid inventory search, not a search incident to arrest; (2) even assuming *arguendo* that the search was unlawful under *Gant*, the motion should nevertheless be denied because the seized items would have been inevitably discovered after the vehicle had been towed, impounded and inventoried; (3) under *United States v. Wurie*, 728 F.3d 1 (1st Cir. 2013), the defendant's cellular phone was properly searched incident to arrest and a warrant was later obtained to search the other cell phones; (4) the scanning of the magstripes did not constitute an unlawful search because there was no reasonable expectation of privacy in the data contained on the magstripes; and (5) because Harvey was properly detained during the pendency of the records check, he was also properly detained—until the officers could confirm or dispel their suspicions of his involvement in criminal activity—after Davidson discovered a large quantity of credit/debit/gift cards in the vehicle.

After a lengthy suppression hearing, the magistrate judge recommended that the district court deny Bah and Harvey's motions to suppress. First, crediting Davidson's and Johnson's testimony, the magistrate judge found that the vehicle search was a valid inventory search. The judge explained:

> Officer Davidson testified that the Altima had to be towed and impounded because:

---

[6]Harvey did not specifically challenge the cell phone and magstripe "searches" in his initial motion to suppress. However, in his "Reply to United States' Response to Allen Harvey's Motion to Suppress," Harvey attempted to distinguish *United States v. Alabi*, 943 F. Supp. 2d 1201 (D.N.M. 2013), a case that held that reading the magnetic strips of a credit/gift card did not constitute a search.

(1) Bah was under arrest.  For obvious reasons, he could not drive the car.

(2) In any event, Bah did not have a valid drivers license;

(3) No one other than Bah was an authorized driver under the Hertz rental contract, and the officers could not unilaterally amend the contract to allow someone else to drive the car;

(4) Harvey could not drive the vehicle because he was not an authorized driver and his license also was suspended; and

(5) Both men were from New York and obviously had no "friends or relatives" in the Morristown area.

Defendants' argument that Officer Davidson's true motive was to search the vehicle for evidence of a crime, and not merely to inventory it prior to its towing and impoundment, is rejected.  Officer Davidson's testimony regarding his motivation in performing a search of the car is supported by the physical facts. . . . The car simply could not stay where it was. . . . And Bah could not move it, and neither could Harvey.

The judge also, *sua sponte*, concluded that Harvey lacked standing to contest the search of the rental vehicle because Bah was the only authorized driver.

Second, the magistrate judge rejected Bah's contention that retrieving data from the magstripes constituted a search, because "[a]n owner or possessor of a credit, debit, or gift card has no reasonable expectation of privacy in the data encoded on the magnetic strip."  Third, the magistrate judge refused to suppress evidence from the cellular phones because, even assuming that the initial warrantless search of Bah's cell phone had been unlawful, a warrant was ultimately obtained without any reference to the allegedly improperly collected information.  And fourth, the magistrate judge found Harvey's detention reasonable.  The magistrate judge reasoned:

If it be assumed for the sake of argument that there was no probable cause to arrest Harvey until Agent Kimbrough scanned the credit cards, then Harvey's investigative detention for that period of time was reasonable *under the circumstances*.  Under those circumstances, the police moved with both diligence and dispatch.  Indeed, they did all that they could do.  But, assumption aside, the police already had sufficient probable cause to arrest Mr. Harvey; the scanning of the cards by Agent Kimbrough was merely icing on the probable cause cake.  Perhaps there is an incredibly profligate spender in this country who legitimately has in his possession eighty-six credit, debit, and gift cards, but it is unlikely.  The extraordinary number of credit cards in the car, coupled with Harvey's frenzied movements as Officer Davidson was calling in the information to his dispatcher,

constituted probable cause to believe that the cards were stolen or fraudulent and that Harvey was involved.

After conducting *de novo* review, the district court adopted the magistrate judge's factual findings, overruled Bah and Harvey's objections and denied the suppression motions.

Bah and Harvey entered conditional guilty pleas to "produc[ing], us[ing], and traffic[king] in counterfeit access devices, in violation of 18 U.S.C. § 1029(a)(1) and (c)(1)(A)(i)." They preserved, however, their rights to appeal the denials of their respective suppression motions. The district court then sentenced them to ten months' imprisonment each, and this appeal followed.

On appeal, both Bah and Harvey allege that (1) the warrantless searches of the magnetic strips on the credit/debit/gift cards violated their Fourth Amendment rights; and (2) the court erred in failing to suppress information obtained from the seized cell phones. Harvey additionally contends that his detention—following Bah's arrest—was unreasonable, and that the court erred in finding that the officers conducted a valid inventory search of the rental vehicle.

As an initial matter, Harvey—a passenger with no possessory interest in the rental vehicle—does not have standing to directly contest the legality of the vehicle search on Fourth Amendment privacy grounds.[7] Courts have routinely held that passengers who have no expectation of privacy or possessory interest in a stopped vehicle do not have standing to challenge the validity of a subsequent search of that vehicle on Fourth Amendment privacy grounds. *See, e.g.*, *United States v. Decker*, 19 F.3d 287, 288−89 (6th Cir. 1994); *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007); *United States v. Ghoston*, No. 11-20098 Ma/P, 2012 WL 1391967, at *3 (W.D. Tenn. Feb. 27, 2012); *United States v. Villaverde-Leyva*, No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *15 (N.D. Ga. Dec. 9, 2010).

Though Harvey does not have standing to contest the legality of the vehicle search, he may nevertheless contest the legality of his detention. Passengers have standing to contest the lawfulness of their *seizure*, *Brendlin v. California*, 551 U.S. 249, 251 (2007), and—in doing so—argue that evidence found during an ensuing vehicle search "should be suppressed as fruits of

---

[7]Bah, the only individual authorized to drive the rental car, does not challenge the legality of the vehicle search, effectively conceding that the officers had performed an "inventory" search prior to towing the vehicle.

illegal activity," *Ellis*, 497 F.3d at 612 (internal quotations and citation omitted). Harvey, however, cannot show that the credit cards found in the vehicle should be excluded as the fruits of his unlawful detention for two reasons: (1) the initial traffic stop was lawful; and (2) the credit cards found in the vehicle were not the "fruits" of Harvey's continued detention. In contesting their seizure, passengers often argue that the initial stop was unlawful or that the officers impermissibly expanded the scope and duration of their detention during the traffic stop. *See, e.g.*, *Brendlin*, 551 U.S. at 251; *Ellis*, 497 F.3d at 612. First, Harvey does not contend—nor can he—that the initial stop was unlawful. Officer Davidson stopped the vehicle in which Harvey was a passenger after observing it traveling 56 miles per hour in a 35-mile-per-hour construction zone. Second, even assuming that Harvey's continued detention while Officer Davidson searched the car was unlawful—a premise refuted below—Harvey still cannot show that the evidence discovered in the vehicle was the "fruit" of his unlawful detention; rather, the cards found in the vehicle were the "fruits" of Bah's arrest for driving on a suspended license and the subsequent need to tow and inventory—pursuant to standard police operation procedures—the vehicle. Stated another way, if we were to suppose that at the time of Bah's arrest, the police had indicated that Harvey was free to leave, the cards in the vehicle would still have been discovered because they were located in a car rented and controlled by Bah (who had been arrested), a car over which Harvey had no control. Ultimately, because Harvey's continued detention was not the cause of the search of Bah's rental vehicle and Harvey does not contest either the legality of the initial stop or Bah's arrest, Harvey cannot show that the credit, debit and gift cards found during the vehicle search should be suppressed as the fruits of his unlawful detention.

Harvey does, however, have standing to contest the reasonableness of his prolonged detention and argue that the cards found in his wallet and those found in the back seat of Officer Johnson's police cruiser should have been excluded. Harvey's pre-arrest detention, however, was reasonable in light of the totality of the circumstances because the officers—during the course of the traffic stop—had both reasonable suspicion and probable cause to continue Harvey's investigative detention and, in any event, pursued their investigation diligently and without undue delay. The Fourth Amendment prohibits only *unreasonable* searches and seizures. U.S. Const. amend. IV. To determine whether a search was "unreasonable," a court must consider the "totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Here, after Officer Davidson initiated the traffic stop, the legality of which Harvey does not contest, Officer Davidson had two lawful reasons for asking Harvey to exit the vehicle and provide identification *even after* Bah had been arrested. First, Officer Davidson had observed Harvey "fumbling around the passenger's side compartment," which gave Officer Davidson reasonable suspicion that Harvey could be armed or trying to hide a weapon in the vehicle. Officer Davidson's fear for officer safety, in turn, afforded him the right to ask Harvey to exit the vehicle and provide identification, and to conduct a protective sweep of the passenger compartment. "'A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a . . . passenger out of a car during a traffic stop, . . . and conducting pat-down searches upon reasonable suspicion that they may be *armed* and *dangerous.*'" *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)) (emphasis in original). Concerns for officer safety also permit an officer to "'ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *Id.* (quoting *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000)). "[I]f an officer possesses a reasonable suspicion that a suspect is armed and dangerous, he may conduct a brief protective sweep of the suspect's vehicle, so long as that search is constrained to places where a weapon may be hidden." *United States v. Graham*, 483 F.3d 431, 439−40 (6th Cir. 2007).

Second, Officer Davidson was planning to conduct an inventory search in accordance with City of Morristown General Orders 500.51, ¶ 6, and 200.04B, ¶ I.1.a, before having the vehicle towed, which would necessarily require that Harvey exit the vehicle. Inventory searches of vehicles subject to impoundment are permitted, provided the scope of the inventory search is authorized by standardized police procedures. *Colorado v. Bertine*, 479 U.S. 367, 371, 374−76 (1987). Thus, the officer's request that Harvey exit the vehicle and provide identification—and the subsequent search of the passenger compartment—was not unreasonable under the circumstances.

Once Officer Davidson discovered four credit, debit, and gift cards in the glovebox—the same area where Davidson had previously observed Harvey "fumbling around"—and 68 credit,

debit, and gift cards in the trunk during the inventory search, the officers had probable cause to arrest Harvey on suspicion of identity theft. Probable cause is a common-sense concept defined by the "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotations and citation omitted). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Id.* at 371. As the magistrate judge explained, the record here suggests that Officer Davidson, upon finding such a large quantity of cards, had "probable cause to believe that Harvey at the very least jointly possessed them with Bah and that they were fraudulent":

> [T]he police already had sufficient probable cause to arrest Mr. Harvey; the scanning of the cards by Agent Kimbrough was merely icing on the probable cause cake. Perhaps there is an incredibly profligate spender in this country who legitimately has in his possession eighty-six credit, debit, and gift cards, but it is unlikely. The extraordinary number of credit cards in the car, coupled with Harvey's frenzied movements as Officer Davidson was calling in the information to his dispatcher, constituted probable cause to believe that the cards were stolen or fraudulent and that Harvey was involved.

Even though the officers chose not to arrest Harvey until after the cards had been scanned at the station, the officers nevertheless had probable cause to detain him at the scene of the traffic stop, thus justifying his continued detention and transport to the police station. As a result, the cards found in Harvey's wallet and in the back seat of the police cruiser were properly admitted.

Harvey contends, however, that there was a brief period during the traffic stop when the officers had neither reasonable suspicion nor probable cause to detain him: the time between when Officer Davidson concluded his search of the passenger compartment, having found no weapons, and Officer Davidson's search of the trunk. However, a review of the traffic stop video does not support such a finding. Harvey is asked to exit the vehicle and provide identification approximately ten minutes into the traffic stop. At 10:22, Officer Johnson conducts a weapon check of Harvey and at 11:16, calls in Harvey's license information for a background check. Around 12:25, Officer Davidson begins the inventory search on the driver's side, and between 13:51 and 15:15, searches the passenger compartment. It is not until 16:03 that Officer Davidson mentions that Harvey's license was not valid—thus concluding the identification check—though, on the basis of poor quality audio, the officers may have learned of

Harvey's suspended license as early as 13:10. Officer Davidson then starts his search of the trunk at approximately 15:30, after Harvey had already informed the officers that he had a bag in the trunk. Officer Davidson searches Harvey's bag until approximately 19:45. Shortly thereafter, Officer Davidson discovers the debit, credit, and gift cards in the other bag in the trunk.

Under Harvey's logic, officers had neither reasonable suspicion nor probable cause to detain him between 15:15—the end of Officer Davidson's search of the passenger compartment—and 20:05 (the point at which the cards were found), a time period of at most five minutes. Harvey, however, ignores two key facts. First, Officer Davidson had reasonable suspicion to detain Harvey for investigatory purposes after he found four credit/debit/gift cards in the glove box—the area where Harvey had previously been "fumbling around." In fact, at 18:40, while still conducting a search of Harvey's bag in the trunk, Officer Davidson asked Harvey about the cards found in the glove box, showing particular interest in the fact that one of the cards had not yet been activated. Harvey's furtive movements in the area where the cards were found and the fact that one of the cards had not yet been activated, provided the reasonable and articulable suspicion of criminal activity needed to justify Harvey's further investigatory detention. "[O]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (internal quotations and citation omitted). And given that the "investigatory detention" lasted at most five minutes, the record supports finding that the officers diligently pursued their investigation under the circumstances. "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (citation omitted).

Second, less than fifteen seconds after Officer Davidson completed his search of the passenger compartment, and before Officer Davidson began a search of the trunk, Harvey informed the officers that one of the bags in the trunk belonged to him. In light of this

information, it would have been reasonable for the officers to assume that Harvey did not intend to leave without his belongings. It follows that Harvey's continued detention as Officer Davidson searched Harvey's backpack for weapons was reasonable, particularly given Harvey's furtive movements and Officer Davidson's concerns regarding officer safety. The 68 credit, debit and gift cards were found almost immediately after Officer Davidson completed his lawful search of Harvey's bag. The record does not support finding that Harvey's continued detention for the five contested minutes was unreasonable.

Harvey mistakenly relies on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), a case in which the Supreme Court recently held that, absent reasonable suspicion, police officers cannot prolong a traffic stop—even for seven to eight minutes—solely to conduct a dog sniff. Harvey cites *Rodriguez* to argue that his continued detention following Bah's arrest for "the *purposes* of an 'inventory search' of the trunk was unlawful." (Emphasis added.) Yet, in so arguing, Harvey minimizes the facts of his case and fails to acknowledge meaningful, factual distinctions between his detention and that described in *Rodriguez*. For instance, unlike in *Rodriguez* where the officers extended the traffic stop—without any individualized suspicion—after all tasks tied to the traffic infraction had been completed, *id.* at 1614, 1616, the officers here had reasonable suspicion to continue Harvey's detention: during the protective sweep of the passenger compartment—which Harvey in his Rule 28(j) Letter apparently concedes was lawful—they found four credit, debit and gift cards, including one which had not yet been activated, in the glove box where Harvey had been "fumbling around." Thus, Harvey was not detained for "the purposes of an 'inventory search,'" a search that would have been conducted even if Harvey had been released, but rather to permit the officers to confirm or dispel their suspicions surrounding the cards. Second, where the police officers in *Rodriguez* refused to let Rodriguez leave after the citation had been issued, much of Harvey's continued detention resulted from his decision to inform the officers that he had a bag in the trunk.

The warrantless scans of the magnetic strips on the credit, debit, and gift cards also did not violate Bah's and Harvey's Fourth Amendment rights because the scans did not constitute a "search." The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches* and seizures,

shall not be violated." U.S. Const. amend. IV (emphasis added). No "search" occurred when law enforcement read the magnetic strips on the backs of the fraudulent cards because: (1) the scans did not involve a physical intrusion of a constitutionally protected area—as required under the trespass-based search analysis; and (2) the scans did not violate the cardholders' reasonable expectations of privacy under *Katz v. United States*, 389 U.S. 347 (1967), and cases following *Katz.*

First, the scans of the magnetic strips of the credit and gift cards did not involve physical intrusions into constitutionally-protected areas. As the district court in *United States v. Alabi*, 943 F. Supp. 2d 1201 (D.N.M. 2013) explained,[8] "both *United States v. Jones*[, 132 S. Ct. 945 (2012)] and *Florida v. Jardines*[, 133 S. Ct. 1409 (2013)] involved situations in which 'the Government obtain[ed] information by *physically* intruding' into an area," either by physically attaching a GPS device to a private individual or invading the curtilage of an individual's home to conduct a dog sniff. *Alabi*, 943 F. Supp. 2d at 1265 (citation omitted). "[S]liding a card through a scanner to read virtual data[, however,] does not involve" any such physical invasions. *Id.* Thus, when law enforcement officers *lawfully possess* credit, debit or gift cards, scanning the cards to read the virtual data contained on the magnetic strips involves no physical penetration of constitutionally protected space. *Id.*

Second, even assuming for the sake of argument that Bah and Harvey hold a *subjective* expectation of privacy in the magnetic strips[9]—strips that include their account number, a bank identification number, the card's expiration date, a three digit "CSC" code, and, at times, the cardholder's first and last name[10]—neither Bah nor Harvey holds a *reasonable* expectation of

---

[8]The Tenth Circuit affirmed this district court judgment in *United States v. Alabi*, 597 F. App'x 991 (10th Cir. 2015), holding that the evidence obtained from reading the magnetic strips on the credit card was admissible under the inevitable discovery doctrine. *Id.* at 1000. The court did not address "whether the scan of the strips constituted a search for Fourth Amendment purposes, and, if so, whether that search was reasonable." *Id.*

[9]This is far from clear. As the court in *Alabi* noted, "courts have invoked [the subjective expectation prong] to hold that a person's disclosure of something in which the person asserts he or she has a reasonable expectation of privacy precludes finding the manifestation of such a subjective belief." 943 F. Supp. 2d at 1274. Though there is no evidence definitively proving that Bah and/or Harvey had yet used any of the magnetic strips on the credit cards to purchase goods, Agent Allen testified at the motion to suppress hearing that some of the associated accounts had already incurred fraudulent charges. It is possible that, had Bah and Harvey already knowingly used the credit cards in public, they would fail to meet even the subjective prong of the *Katz* test.

[10]At oral argument, counsel for Bah and Harvey both contended that the "most private" information disclosed when officers scan a gift/credit/debit card is the amount of money remaining on the cards. The parties did not, however, raise this argument in their briefs and, in any event, we do not find the argument persuasive. After all,

privacy in the magnetic strips.  Because the information on the magnetic strips, with the possible exception of a "few other additional, unique identifiers," mirrors that information provided on the front and back of a physical credit, debit or gift card, and the magnetic strips are routinely read by private parties at gas stations, restaurants, and grocery stores to accelerate financial transactions, such an expectation of privacy is not one that society is prepared to consider reasonable.  Courts "must determine whether the [individual's] subjective privacy interest is 'legitimate,' by analyzing whether it is an 'interest in privacy that society is prepared to consider reasonable.'"  *Alabi*, 943 F. Supp. 2d at 1275 (quoting *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)).

Every court to have addressed this question has reached the same conclusion.  Some courts have stressed that there can be no reasonable expectation of privacy in an account number—and consequently, magnetic strip—that is routinely shared with cashiers every time the card is used.  For instance, in *United States v. Medina*, No. 09-20717-CR, 2009 WL 3669636 (S.D. Fla. Oct. 24, 2009) (rev'd on other grounds), the court emphasized that "the credit card holder voluntarily turns over his credit card number every time he uses the card," and then found that there is "no expectation of privacy in that number." *Id.* at *11.  The court in *United States v. Briere de L'Isle*, No. 4:14-CR-3089, 2014 U.S. Dist. LEXIS 151078 (D. Neb. Oct. 24, 2014), likewise suggested that "[s]ociety is not prepared to accept as legitimate an asserted privacy interest in information that any member of the public may see." *Id.* at *7.

Other courts have emphasized the fact that the scan of the magnetic strip reveals little—to potentially nothing—that cannot be viewed on the front and back of the physical card; consequently, these courts have reasoned that once law enforcement personnel have *lawful*, physical possession of the card, the scan does not constitute a separate "search."  In *Medina*, for instance, the court explained:

> The magnetic strip on the back of a credit card, unlike a hard drive or an external electronic storage device, is designed simply to record the same information that is embossed on the front of the card.  On a legitimate card the information will match.  A credit card reader merely verifies the information that cannot be read by

officers in lawful possession of an individual's wallet can count the money present.  The additional information provided by a scan of a gift card—namely, that an individual spent a specific amount of money at a specific store—is not a meaningful distinction, particularly given that the store is disclosed on the face of the card.

the naked eye. Using a credit card reader to verify that the information matches is analogous to swiping a driver's license (featuring a magnetic strip with biographical information encoded therein) through a police vehicle computer to run a background check. It is analogous to using an ultraviolet light to detect whether a treasury bill is authentic, an act that even Defendant does not contend constitutes a separate "search."

2009 WL 3669636, at *10. The court in *Alabi* similarly reasoned:

Issuing financial institutions store on their credit and debit cards' magnetic strips, when they issue a credit or debit card to a cardholder, the same information on every card that they issue: one character and then the account information identical to the account information embossed on the front of the front of the card.

[ . . .]

A privacy expectation in the account information on credit and debit cards' magnetic strips—separate and beyond the credit and debit cards themselves—is [thus] not objectively reasonable.

943 F. Supp. 2d at 1279−80.

Finally, other courts focus on the fact that a scan of the magnetic strip will usually only disclose the presence or absence of activity that is not legal. The reasonable-expectation-of-privacy test in concept "presupposes an *innocent* person," *Florida v. Bostick*, 501 U.S. 429, 438 (1991), and "government conduct that only reveals the possession of contraband compromises no legitimate privacy interests." *Briere de L'Isle*, 2014 U.S. Dist. LEXIS 151078, at *9 (citing *Caballes*, 543 U.S. at 408−09). The *Alabi* court thus reasoned:

Similar to a drug sniff alerting the handler only to the presence of narcotics—information about illegal activity—scanning credit and debit cards to read the information contained on the magnetic strips, when law enforcement already has physical possession of the cards, will disclose "only the presence or absence of" illegal information: either the information disclosed is the same information on the outside of the credit and debit cards, or is information about a different account, used to commit credit card fraud. . . . Such a limited investigatory technique to quickly and obviously provide information whether the payment form is being used criminally . . . does not violate the Defendant's right to be secure in their person, house, papers, or effects.

943 F. Supp. 2d at 1271, 1273. The question presented here lies at "an intersection . . . between the principle that there is no legitimate privacy interest in already-known information, and . . . no legitimate privacy interest in contraband." *Briere de L'Isle*, 2014 U.S. Dist. LEXIS 151078, at

*9.  In light of those principles, when law enforcement has lawful physical possession of the credit, debit and gift cards—as the officers did here—there is no separate privacy interest in the magnetic strip beyond that in the cards themselves.

Two arguments raised by Harvey and Bah deserve a brief response.  First, Harvey contends that because he did not "voluntarily relinquish[] the data by offering it for use to obtain a good in return," the reading of the magnetic strip was a search.  Bah, somewhat similarly, appears to suggest that, because the average American, "[w]hen arrested for a suspended license . . . would not anticipate law enforcement going through their wallet and swiping anything with a magstripe through a reader," the scans were unlawful searches.  It is true that neither Harvey nor Bah "consented" to the scans or "relinquished" their cards in the course of a financial transaction; however, because law enforcement here came into *lawful* possession of the cards, as outlined above, Bah and Harvey retained no additional privacy interest in the magnetic strips.

Second, because the magnetic strip on a credit card does not contain the same quality or quantity of personal information that can be found on cell phones, computers, or cassette tapes, the reasoning underlying the Court's recent opinion in *Riley v. California*, 134 S. Ct. 2473 (2014), does not apply.  In holding that cell phones generally cannot be searched without a warrant, the *Riley* Court focused on the "quantity and quality of personal information that can be obtained from a modern smartphone, and the expectation of privacy that an individual may have in such information." *Briere de L'Isle*, 2014 U.S. Dist. LEXIS 151078, at *10−*11 (discussing *Riley*).  "Modern cell phones," the Court explained, "implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley*, 134 S. Ct. at 2488−89.  The cell phone's storage capacity alone permits "[t]he sum of an individual's private life [to] be reconstructed through a thousand photographs labeled with dates, locations, and descriptions" and "collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video." *Id.* at 2489.

No such concerns are present here.  The storage capacity of the magnetic strip of a credit, debit or gift card pales in comparison to that of a computer hard drive, cell phone, or even audiocassette.  According to Bah, each magstripe contains three data strips which hold only 79 alphanumeric characters, 40 numeric characters, and 107 numeric characters, respectively.

Given the magnetic strip's limited storage capacity, a reading of it—even assuming it had been re-encoded—would not allow officers to reconstruct an individual's private life. Further, the evidence stored on the strip—which, unless re-encoded, would more or less match that provided on the front and back of the card—is not the highly personal information an individual would expect to keep private, especially after the physical card is in the lawful possession of law enforcement or a cashier. In fact, as the court in *Briere de L'Isle* explained:

> A credit card's stored information, unlike a smartphone's, is *intended* to be read by third parties. That is the only reason for its existence. There is simply no basis to extend *Riley* to digital information that literally has no purpose other than to be provided to others to facilitate financial transactions.

2014 U.S. Dist. LEXIS 151078, at *11; *see also Alabi*, 943 F. Supp. 2d at 1284. It is true, as Bah contends, that warrants are required to listen to the contents of cassette tapes and "magnetic storage media" requests are often included in warrant applications; Bah, however, fails to appreciate that the magnetic strip on a credit, debit, or gift card, given its limited storage capacity and tendency to contain only that information that would already be known to an individual in lawful possession of the physical card, is readily distinguishable from storage media where the contents are often truly unknown. Our holding today is limited in scope—addressing only the ability of police enforcement to conduct warrantless searches of the magnetic strips on credit cards, gift cards and debit cards—and we do not address hypothetical magnetic strips of the future that may have greater storage capacity and tend to store more private information.

Finally, the initial, warrantless search of Bah's damaged Blackberry cell phone incident to Bah's arrest was unconstitutional, a point conceded by the United States in light of the Supreme Court's recent opinion in *Riley v. California,* 134 S. Ct. 2473 (2014). "[A] warrant is generally required before [a cell phone] search, even when a cell phone is seized incident to arrest." *Id.* at 2493.

Despite the Fourth Amendment violation, however, the district court properly denied Bah and Harvey's motions to suppress because the officers' initial, unconstitutional search of the Blackberry did not taint the subsequent cell phone searches conducted pursuant to the later-

obtained search warrant.[11]   Here, the magistrate judge's determination of whether to issue the warrant was not tainted by the illegally obtained evidence because Officer Allen intentionally omitted any discussion of such evidence from the warrant affidavit,[12] relying instead on the results of the scans of the magnetic strips of Bah's and Harvey's counterfeit cards to establish probable cause.   In analogous—though not identical—situations where tainted evidence is actually included in the warrant affidavit, courts have found that its "mere inclusion . . . does not, by itself, taint the warrant or the evidence seized pursuant to the warrant," such that exclusion is automatically required.  *United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996) (internal quotation marks and citation omitted).   Instead, in determining whether to apply the exclusionary rule, courts remove the illegally obtained fact from the affidavit and "consider[] whether there is still sufficient information to establish probable cause" for the search.  *United States v. Davis*, 430 F.3d 345, 357−58 (6th Cir. 2005); *see also Reilly*, 76 F.3d at 1282 n.2.   By omitting the tainted evidence from the warrant affidavit, Officer Allen voluntarily removed—*ex ante*—the "illegally obtained facts" and permitted the magistrate judge to make an untainted probable cause determination.   Because neither Bah nor Harvey argues that the warrant affidavit failed to establish probable cause in the first instance, exclusion is not warranted.

We are, however, troubled by the officer's failure to inform the magistrate judge that, prior to the warrant application, separate officers had conducted a warrantless search of the Blackberry.  A review of the particular circumstances of this case, however, supports finding that the omission here was made in good faith—in an attempt not to taint the warrant application, rather than as a means to conceal unlawful police conduct.[13]   In particular, the officers here conducted the warrantless cell phone search at a time when the law regarding the

---

[11]Neither Bah nor Harvey argues that absent the warrantless search of the Blackberry, the officers would not have applied for a warrant to search the cell phones in the first instance.  Consequently, we do not address whether the images found on the Blackberry "tainted" the officers' decision to seek a search warrant in the first instance.

[12]Bah concedes that "[t]he taint of the warrantless search of the cell phone would be nullified by a search warrant, provided the warrant's affidavit of probable cause did not contain information obtained during the warrantless search of the phone or otherwise obtained in violation of the Fourth Amendment's protections"; Harvey does not so concede, contending instead—without citation to authority—that a later-obtained warrant can *never* cure an initial, unlawful search.  We can find no support in our precedent for this bald assertion.

[13]Under different circumstances, however, where the officers' good faith is less evident or evidence indicates that it was standard police practice to obtain warrants only after finding—through unlawful, warrantless searches—incriminating evidence, the outcome might very well differ.

constitutionality of warrantless cell phone searches incident to arrest was unsettled.**14**  Officer Johnson and Detective Bowman appear to have genuinely believed that cell phone searches incident to arrest were constitutional.  When Agent Kimbrough—who believed a warrant was required—requested that the cell phones be powered off until a warrant could be obtained, however, Johnson and Bowman immediately complied.  Agent Allen then obtained a search warrant to search all four cell phones, relying on an affidavit that did not contain any information from the warrantless search of the Blackberry.  Though the warrantless cell phone search was later found unconstitutional, the officers' overall conduct suggests a desire to afford Bah and Harvey their Fourth Amendment protections.  In this particular set of facts, to find exclusion warranted would do nothing more than impose a "costly toll upon truth-seeking and law enforcement objectives" and "offend[] basic concepts of the criminal justice system" by "letting guilty . . . defendants go free," without a true deterrent effect. *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal quotation marks and citations omitted).

The judgments of the district court are affirmed.

---

**14**As the magistrate judge explained on August 8, 2013:

There is a split of authority on this issue [of whether a warrant was required to search a cell phone incident to arrest].  The First Circuit holds that the police may not search the contents of a cell phone without first obtaining a search warrant, *United States v. Wurie*, [728 F.3d 1] (1st Cir. 2013).  The Fifth and Seventh Circuits have held that a cell phone in the possession of an arrestee may be searched by the police without a warrant as incidental to the arrest; *see*, *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007), and *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996).  The Sixth Circuit has not yet addressed the issue.