NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ANDREW RAYMOND BRIXEY, *Appellant.*

No. 1 CA-CR 18-0669
FILED 10-29-2019

Appeal from the Superior Court in Maricopa County
No. CR2015-147199-001
The Honorable Danielle J. Viola, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

KBunited LLC, Phoenix
By Kerrie M. Droban
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge David D. Weinzweig and Judge Diane M. Johnsen joined.

**H O W E**, Judge:

¶1        Andrew Raymond Brixey appeals his convictions and sentences for aggravated taking the identity of another, taking the identity of another, and obtaining a credit card by fraudulent means or theft. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts presented at trial in the light most favorable to sustaining the verdicts, *State v. Payne*, 233 Ariz. 484, 509 ¶ 93 (2013), and the evidence presented at a suppression hearing in the light most favorable to sustaining the trial court's ruling, *State v. Havatone*, 241 Ariz. 506, 509 ¶ 11 (2017). In September 2015, the Glendale Police Department received an anonymous tip that a woman was using narcotics in a pickup truck at a mall. Officer Michael Acero responded and found Brittany Wellman in the back seat of the truck. He noticed that Wellman had a device wrapped around her arm used to inject narcotics, and he believed that she may have been in the process of ingesting narcotics. Officer Acero arrested Wellman.

¶3        As Officer Acero arrested Wellman, Brixey walked up to the truck. Brixey informed Officer Acero that he did not own the truck but usually drove it. Officer Acero asked Brixey if he could search the truck, and Brixey consented without limitation. Inside the truck, Officer Acero found a blue money bag bearing the name of a bank behind a passenger seat. He opened the bag and found numerous documents containing identifying information — such as checks, tax documents, and identification cards — of persons other than Brixey or Wellman.

¶4        Glendale Police Department detectives learned that Brixey had applied for and received a credit card using another person's name whose identifying information was found in the money bag. The credit card's transaction history showed that Brixey had charged $805.64 on the credit card at several businesses. Security camera footage from the stores confirmed that Brixey purchased items on the dates and times shown in the credit card statements. The police later arrested Brixey in October 2015, and he was indicted for aggravated taking the identity of another, a class 3 felony; taking the identity of another, a class 4 felony; and obtaining a credit card by fraudulent means or theft, a class 5 felony.

¶5        Brixey moved to suppress the contents of the money bag, arguing that the officers conducted a warrantless search of his truck without legal justification. At the evidentiary hearing, Officer Acero

testified that the Glendale Police Department received an anonymous call that a woman was in the back seat of a truck and attempting to "shoot[] up some kind of narcotic in her arm." The caller also described the truck and gave its license plate number. Officer Acero arrived at the mall and found a truck with the same license plate number. He looked through the truck window and saw Wellman slumped over with a string tied above her elbow. When Wellman exited the car, Officer Acero saw a syringe on the floorboard. Wellman admitted that she had "a drug problem" and said that she could not remember if she had just injected heroin or was still looking for a vein. Officer Acero then arrested Wellman.

¶6            Officer Acero testified that shortly after he arrested Wellman, Brixey approached. Officer Acero asked Brixey for consent to search the truck, and Brixey said that "there was no problem." Officer Acero found the money bag behind a passenger seat and, thinking that it might be a "drug kit[], with paraphernalia in it," he opened it to see if it contained anything related to narcotics. Instead, Officer Acero found "driver's licenses, checks, [a] passport, more I.D.'s, more checks, and . . . a W–2."

¶7            Officer Acero also testified that he asked Brixey who the money bag and documents belonged to, and Brixey claimed that they belonged to Wellman. Wellman, however, claimed that they belonged to Brixey. In addition to Officer Acero, Officers Genero Itri and Daniel Gonzales testified that Brixey had consented to the search. All three officers testified that Brixey never withdrew his consent to the search.

¶8            Brixey testified that he gave permission to remove Wellman's belongings from the truck but did not consent to a general search of the truck. He also stated that when Officer Acero began to search the truck, he told the officers that he had not given permission to search his truck. The trial court concluded that based on the totality of the circumstances, the three officers' version of the facts was more credible than Brixey's version. The court subsequently denied suppression.

¶9            Brixey later moved a second time to suppress the contents of the money bag, claiming that the plain view doctrine did not apply because the incriminating nature of the documents was not immediately apparent. The State responded that Brixey's consent to search the truck for narcotics included searching the money bag because narcotics could have been within it.

¶10            At the second evidentiary hearing, Officer Acero testified that when Brixey gave him permission to search the truck, he did not limit his

consent to any part of the truck. During the search he found a blue bag that was large enough to contain narcotics or paraphernalia. Officer Acero also testified that after he unzipped the bag, he did not take any documents out but only "thumbed through" them to search for narcotics or paraphernalia. While doing so, he noticed that the documents contained names and pictures of people other than Brixey or Wellman. At this point, Officer Acero stated that he suspected Brixey may be involved in some form of fraud. Officer Acero then testified that Brixey and Wellman both denied ownership of the bag and both claimed it belonged to the other person. The trial court found that the scope of Brixey's consent included the bag and that the names on the documents were in plain view. The trial court subsequently denied suppression.

¶11        At trial, three victims testified that Brixey did not have permission to possess or use the identifying documents in the money bag and a fourth victim testified that he never applied for the credit card at issue and did not make the charges on the credit card. The jury found Brixey guilty as charged. It also found as aggravating factors that he committed the offenses for pecuniary gain and caused financial harm to the victim of the credit card offense. Brixey admitted that he was on felony release when he committed the offenses. He also admitted to five prior felony convictions. The court sentenced him to concurrent terms of 16 years' imprisonment for aggravated taking the identity of another, 14 years' imprisonment for taking the identity of another, and 9 years' imprisonment for obtaining a credit card by fraudulent means or theft. Brixey timely appealed.

## DISCUSSION

### 1. Voluntary Consent

¶12        Brixey argues that the trial court abused its discretion when it denied his motions to suppress evidence seized during a warrantless search because he did not consent to a search, or alternatively, the search exceeded the scope of his consent.[1] A trial court's ruling on a suppression motion is reviewed for an abuse of discretion, considering only the evidence at the suppression hearing. *Havatone*, 241 Ariz. at 509 ¶ 11. This Court defers to the trial court's factual findings, including findings on credibility, when

---

[1]        On appeal, the State counters, among other things, that Brixey lacked standing to challenge the search because he abandoned any privacy interest in the bag by claiming that it did not belong to him. We decline to address this argument because the State did not present it to the trial court.

reviewing a suppression motion. *State v. Moran*, 232 Ariz. 528, 531 ¶ 5 (App. 2013). Legal and constitutional issues are reviewed de novo. *State v. Huerta*, 223 Ariz. 424, 426 ¶ 4 (App. 2010).

**¶13**　　　　The Fourth Amendment to the United States Constitution and Article 2, Section 8, of the Arizona Constitution protect against unreasonable searches and seizures. *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7 (2015). Generally, a warrantless search will be considered unreasonable unless an exception applies. *California v. Carney*, 471 U.S. 386, 390 (1985). One of those exceptions is when a person voluntarily consents to a warrantless search. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991); *State v. Valenzuela*, 239 Ariz. 299, 302 ¶ 11 (2016). The State has the burden to prove voluntary consent by a preponderance of the evidence. *Id.* at 302–03 ¶ 11.

**¶14**　　　　"Determining the validity of a law enforcement officer's search based on consent generally involves two factors: (1) whether the consent was voluntarily given and (2) whether the search was within the scope of the consent." *State v. Becerra*, 239 Ariz. 90, 92 ¶ 8 (App. 2016) (citing *State v. Paredes*, 167 Ariz. 609, 612–13 (App. 1991)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. The scope of a search "is generally defined by its expressed object." *Id.* Thus, because a reasonable person may be expected to know that narcotics are generally carried in some form of a container, an objectively reasonable officer may conclude that a general consent to search a car includes consent to search containers within the car that might contain narcotics. *Id.*

**¶15**　　　　Here, three officers testified at the first suppression hearing that Brixey voluntarily consented to their searching the truck, did not limit the scope of the search, and did not revoke his consent. That evidence is sufficient to support the trial court's finding that Brixey gave consent. Although Brixey notes that he testified that he did not give consent to the search, the trial court found the officers to be more credible. Because the trial court is in the best position to make that determination, this Court defers to its conclusion. *See Moran*, 232 Ariz. at 531 ¶ 5.

**¶16**　　　　Regarding the scope of Brixey's consent, the evidence showed that Brixey did not qualify his consent to search the truck. He did not prohibit Officer Acero from searching any containers in the truck, including the money bag. Additionally, Brixey never revoked his consent. Thus,

Brixey's consent allowed Officer Acero to search any containers in the truck for narcotics, including the money bag. *See Jimeno*, 500 U.S. at 251.

## 2. Plain View Doctrine

¶17 Brixey also argues that the trial court should have suppressed the evidence seized from the money bag because the incriminating nature of its contents was not "immediately apparent" to Officer Acero, thereby making the plain view doctrine inapplicable. "The [plain view] doctrine allows police to seize an object if they are lawfully in a position to view it, if its incriminating character is immediately apparent, and if they have a lawful right of access to it." *State v. Sisco*, 239 Ariz. 532, 535 ¶ 11 (2016) (internal citations omitted). "Although the phrase immediately apparent might suggest near certainty, the [United States Supreme] Court has rejected such an unduly high degree of certainty as to the incriminatory character of evidence for application of the plain view doctrine . . . clarifying that police need only have probable cause to associate the object with criminal activity." *Id.* at 536 ¶ 12 (internal quotations and citations omitted). An officer "is not required to close his eyes to evidence which is in plain view." *State v. Kelly*, 130 Ariz. 375, 378 (App. 1981) (concluding that glancing at documents not listed in a search warrant is permissible, but reading the documents is not).

¶18 Here, Officer Acero received Brixey's consent to search the truck for narcotics related to Wellman's arrest, and the search included opening containers that could hold narcotics. Officer Acero therefore was in a lawful position to view the money bag and had lawful access to it and its contents. Upon noticing that the names on the documents were not Brixey's or Wellman's, Officer Acero suspected that some sort of fraud may have been taking place. Officer Acero then asked Brixey and Wellman if either of them owned the bag, which they both denied. At that point, he seized the documents. The presence of numerous financial and identification documents bearing names and pictures of individuals other than Brixey or Wellman showed probable cause that the documents were associated with a crime. *See United States v. Bah*, 794 F.3d 617, 627 (6th Cir. 2015) (concluding that officers had probable cause to arrest a defendant on suspicion of identity theft after they found numerous credit, debit, and gift cards during an inventory search). Thus, the trial court did not err in finding that the plain view doctrine applied.

¶19 Relying on *State v. Shinault*, 120 Ariz. 213 (App. 1978), *United States v. Garcia*, 496 F.3d 495 (6th Cir. 2007), and *United States v. Padilla*, 986 F.Supp. 163 (1997), Brixey argues that the officers conducted an

unlawful exploratory search of the bag's contents. The facts here, however, are distinguishable from all three cases.

¶20　　　In *Shinault*, officers found a ledger with a blank cover in a box while executing a search warrant for firearms and narcotics. 120 Ariz. at 215. The officers opened the ledger, read its contents, and learned that it referenced drug transactions. *Id.* An officer admitted that one purpose for searching the ledger was to find records of who lived in the residence, which was not a purpose stated in the warrant. *Id.* Thus, the Court concluded that the ledger's contents were not discovered inadvertently. *Id.* The Court further concluded that even if the ledger had been discovered inadvertently, its evidentiary value was not immediately apparent because its connection to narcotics was only discovered after an officer conducted an exploratory search by opening the ledger and studying its contents. *Id.*

¶21　　　In contrast to the officer in *Shinault*, Officer Acero did not study the documents in the money bag, and he simply noticed others' names on the cards and documents as he glanced through them. *See Kelly*, 130 Ariz. at 378 (distinguishing its facts from *Shinault* and concluding that glancing at documents is permissible while reading them is not). Also, the names on the documents were sufficient to alert Officer Acero of a possible fraudulent crime without studying the documents further to make that determination. Moreover, unlike in *Shinault*, Officer Acero testified that his only purpose in searching the bag was to find additional narcotics evidence.

¶22　　　In *Garcia*, a search warrant allowed officers to search a house only for cocaine. 496 F.3d at 501. During the search, officers seized numerous documents, including crumpled pieces of notebook paper with mathematical calculations, receipts, other financial records, and invoices. *Id.* At trial, an officer testified that he needed to look through the papers to ensure that they did not contain small packets of cocaine, but he admitted that reading the documents was unnecessary in his search for cocaine. *Id.* at 510. As a result, the court concluded that the criminal nature of the documents seized was not immediately apparent because when unread, the officers did not have probable cause to believe that they were associated with criminal activity. *Id.* at 511. Here, however, unlike the officer in *Garcia*, Officer Acero never stated that he attempted to read the documents. In contrast, he testified that as he searched the bag for narcotics, he simply glimpsed the names on the documents.

¶23　　　In *Padilla*, officers arrived at a defendant's home with an arrest warrant. 986 F.Supp. at 166. The defendant consented to a search of her home, stating that they could "look anywhere, you will see there is no

drugs, there is no guns, I have done no drug dealing[.]" *Id.* The officers then seized pieces of mail, business cards, pieces of paper with telephone numbers on them, a notebook, a copy of a lease agreement, an address book, a telephone bill, and a food coupon. *Id.* at 167. The district court determined that the defendant's consent was limited to only drugs and weapons. *Id.* at 169. The court then found that the officers were not permitted to "peruse" the documents to determine if they were incriminatory. *Id.* at 170. Because the officers had to peruse the documents before discovering their incriminatory nature, the court determined that their incriminatory nature was not immediately apparent. *Id.* The court did note, however, that officers may "glance" at documents to see if their incriminatory nature is immediately apparent. *Id.* Here, Officer Acero's actions differed from the officers in *Padilla*. Officer Acero merely glanced at the identifying documents as he executed his search for narcotics; he did not peruse them. As such, the trial court did not err in concluding that he did not engage in an exploratory investigation.

**CONCLUSION**

¶24        For the foregoing reasons, we affirm.

